NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided:   March 5, 2024

S23A1201.  SINKFIELD v. THE STATE.

BOGGS, Chief Justice.

Appellant Remond Sinkfield challenges his convictions for felony murder and other crimes in connection with the death of Levi Atkinson, who either was pushed or jumped out of a moving vehicle after an altercation with Appellant, was struck by another car, and died from his injuries five days later. Appellant contends that the evidence was insufficient to support his convictions for felony murder and theft by taking; that the trial court erred in denying his motion to suppress a pretrial interview by police; that the trial court committed plain error in several ways; and that the trial court abused its discretion in various evidentiary rulings. He also contends that he was denied effective assistance of counsel due to his trial counsel's deficiencies, including by failing to retain a

medical expert to testify as to the cause of Atkinson's death. For the reasons that follow, we affirm.[1]

1.     The evidence presented at trial showed the following.[2] Appellant and Atkinson were acquaintances, and Appellant supplied Atkinson with drugs and prostitutes. Atkinson owned a business and was generous with his money, occasionally paying bills, such as for rent and cell phone service, for Appellant and

---

[1] The crimes occurred on January 24, 2012. It appears that Appellant was first indicted in 2012, but the record does not contain that indictment. On October 14, 2014, a Fulton County grand jury re-indicted Appellant for felony murder, involuntary manslaughter, aggravated assault with intent to rob, theft by taking (auto), and giving false information to a law enforcement officer. At a trial from October 20-24, 2014, the jury acquitted Appellant of involuntary manslaughter and convicted him on all other counts. The trial court sentenced Appellant to life in prison with the possibility of parole for felony murder, a ten-year consecutive sentence for theft by taking, and a twelve-month consecutive sentence for giving false information. The aggravated assault count merged into the felony murder conviction. Appellant filed a premature motion for new trial, and that motion ripened upon the entry of the final judgment on October 28, 2014. See *Southall v. State*, 300 Ga. 462, 464-468 (796 SE2d 261) (2017). Appellant amended the motion for new trial with new counsel on June 15, 2021, and February 6, 2023. After an evidentiary hearing on February 22, 2023, the trial court entered an order denying the motion on April 28, 2023. Appellant filed a timely notice of appeal, and the case was docketed in this Court to the August 2023 term and submitted for a decision on the briefs.

[2] Because this case involves questions of harmless error and prejudice stemming from ineffectiveness of counsel, we set out the evidence in detail rather than in the light most favorable to the jury's verdict. See *Wood v. State*, 316 Ga. 811, 812 n.2 (890 SE2d 716) (2023).

others, and also sometimes lent his car to Appellant and others. Late in the evening on January 23, 2012, Atkinson was at his home in Douglas County celebrating his birthday with Deshanqueanna Lundy, who was Appellant's girlfriend. Early the next morning, on January 24, Appellant was driven to Atkinson's home by Cleo Simmons; Lisa Johnson was with them. Appellant delivered crack and powder cocaine to Atkinson, and the four consumed the drugs. Later that morning, Atkinson gave Appellant his ATM card so Appellant could withdraw money to pay for the drugs Appellant had delivered. Appellant and Simmons left the home, drove to an ATM machine, and used Atkinson's ATM card to withdraw $300, which was the daily limit for Atkinson's ATM card; Appellant also bought additional drugs. After Appellant and Simmons returned, the group continued to use drugs.

In the early afternoon, Appellant and Lundy borrowed Atkinson's car and left. After dropping off Lundy, Appellant saw a police officer who knew him and knew that he did not have a valid driver's license. To avoid being arrested for driving with a suspended

license, Appellant turned into a Travelodge motel in Fulton County near the intersection of Fulton Industrial Boulevard and I-20, where he sometimes stayed. Appellant parked Atkinson's car and left.

In the early evening, Atkinson received a call from his friend Charlene Shivers. Shivers told Atkinson that she had seen his car at the Travelodge. Atkinson asked Shivers for a ride so he could pick up his car. When Atkinson and Shivers arrived at the Travelodge, the police were preparing to impound the car, but Atkinson was able to retrieve it and drive it home. By the time Atkinson arrived back home, Johnson and Simmons were gone.

Later that evening, Simmons drove Appellant back to Atkinson's home. Appellant demanded payment for Lundy's time and for the crack cocaine he had delivered earlier in the day; however, Atkinson did not have any cash. Atkinson, Appellant, and Simmons drove away in Atkinson's car. During the drive, Atkinson tried to obtain cash by calling Shivers and his two daughters, who lived in Atlanta. He and Appellant also went to Shivers's room at the Skyway Inn, a motel near the intersection of Fulton Industrial

4

Boulevard and I-20. Atkinson was unable to obtain any cash, and after leaving Shivers's room, Appellant and Atkinson returned to the car, and they picked up Johnson, who had been at the Skyway. Shortly thereafter, Atkinson either jumped or was pushed from the car while it was in the middle of an intersection, and he was hit by at least one other car.

Atkinson was seriously injured, but he spoke with several people at the scene before being transported to the hospital; he died five days later. Maria Gallo, who was in another car in the intersection, testified she saw Atkinson in the middle of Fulton Industrial Boulevard, screaming that he had been kidnapped by men who wanted to kill him. He came over to her car and tried to open the door. She saw two men get out of another car that was stopped in the intersection, walk over to Atkinson, scream at him in an "ugly" way, and aggressively try to take him away. Atkinson continued to scream for help, saying that the men were trying to kill him, and telling the men to leave. When police officers arrived, the two men returned to their car and drove away quickly.

Corporal David Jira of the Fulton County Police Department was the first officer on the scene. Atkinson told him that he had been kidnapped at gunpoint from his home in Douglas County and that when he got to the intersection of Fulton Industrial and I-20, he was pushed from the car. Atkinson told a paramedic at the scene that he jumped out of a car because someone tried to kill him; the paramedic testified at trial that Atkinson smelled of alcohol. About an hour later, Cpl. Jira discovered Atkinson's car parked by a gas pump at a gas station about a mile from the intersection where Atkinson had been injured. Cpl. Jira was familiar with Appellant and knew that he had been identified as a suspect. He saw Appellant inside the gas station, and when Appellant came out to Atkinson's car, Cpl. Jira detained him and asked his name; Appellant answered by giving his brother's name. After being told why he was being detained, Appellant stated that what was alleged was not true; that he did not push Atkinson from the car; and that Atkinson owed his girlfriend approximately $700. When Cpl. Jira confirmed that Appellant had given him the wrong name, he arrested him. No drugs or weapons

6

were found in the car or on Appellant's person at the time of his arrest.

At trial, the State presented evidence showing that the cause of Atkinson's death five days after his admission to the hospital was blood clots, which were a consequence of injuries he received when he fell out of a moving vehicle; the evidence included the medical examiner's testimony, his hospital medical records, and the autopsy report. Specifically, the medical examiner, who performed the autopsy, testified that the cause of death was right pulmonary and bilateral bone thromboembli, or blood clots, due to pelvic, rib, and vertebral fractures. She explained that blood clots were not uncommon when a person has a fracture of the thigh or arm or a pelvic fracture; she also noted that blood clots can take time to develop. She classified the manner of death as a homicide. Additionally, the medical records showed that on the morning of Atkinson's death, he had developed an altered mental status, which the medical examiner testified can be caused by blood clots. The medical examiner acknowledged that Atkinson did not have rib

fractures upon his admission to the hospital, and she opined that he may have sustained the rib fractures as a result of having to be restrained due to his altered mental status or as a result of resuscitation efforts. She also opined that the large blood clot that was visible when she did the autopsy would not have come from the rib fracture because he did not have the rib fracture when he was admitted to the hospital. On cross-examination, she acknowledged that the autopsy did not reveal any injury to Atkinson's neck.

The State called Johnson and Shivers as witnesses. Johnson's pretrial interview with Lieutenant John Cross of the Fulton County Police Department was audio- and video-recorded and played for the jury. In that interview, she explained that she was in the car with Atkinson, Appellant, and Simmons late on the evening of January 24, 2012. Atkinson was driving, Appellant was in the passenger seat, and Simmons was sitting behind Appellant. Appellant and Atkinson were having a heated argument about money that Appellant said Atkinson owed him. Atkinson was talking on the phone with Shivers and others, trying to get money. Atkinson said

8

he would drive back to the Skyway, but Appellant said he did not want to go that way. Atkinson did not appear to be afraid and told Appellant that he would get money in the morning. When Atkinson started to get into a turn lane to turn back toward the Skyway, Appellant got angry and grabbed the steering wheel, forcing the car to go in a different direction. At the next intersection, Atkinson slowed the car, opened the door, and rolled out. The car continued moving until it hit a barrier, and Appellant got in the driver's seat and drove onto I-20. While Atkinson was standing in the intersection, saying "help me, help me," Johnson walked back to the Skyway. Johnson never saw anyone with a gun in the car, although she had seen Appellant with guns in the past.

At trial, Johnson's testimony about what happened on January 24 was largely consistent with her pretrial statement. However, she testified that Appellant and Atkinson were not having a discussion but were both on their phones and that Atkinson was trying to get money so that he could pay her because she was planning to spend the night with him, and he did not want her to have to wait for her

9

money until the morning. She also testified that Appellant told Atkinson, "You driving crazy, you drunk"; that Appellant asked to be dropped off;  that when Appellant grabbed the steering wheel, he told Atkinson, "You finna kill us turning into oncoming traffic"; and that after Atkinson rolled out of the car, Appellant put the car in park, got out of the car, and she "suppose[d]" he  talked to Atkinson. She testified that she did not see what happened to Atkinson's car.

According to Shivers's trial testimony, Atkinson called her while he was in the car with Appellant, asked for money, and said Appellant "was down there with a gun demanding money." Even though Shivers told Atkinson she did not have money, he came to her door at the Skyway; Appellant stood behind him and had his hands in his jacket. When Shivers said she did not have any money, Appellant and Atkinson left. About ten minutes later, Atkinson called her again, but he was interrupted by Appellant "hollering" at him to "go straight." Then the call dropped. Shortly thereafter, Shivers saw Johnson, who told her that Atkinson had been hit by a car; that Simmons had been choking Atkinson; and that Appellant

had been hitting him.[3] Shivers ran to the scene and saw Atkinson being loaded into an ambulance; he told her that Appellant tried to kill him.

The State also called Atkinson's daughter Felicia, and she testified that her father called her the night of January 24, asking for money, which was very unusual. She also had a conversation with him while he was in the hospital. During that conversation, he said that Appellant, Johnson, and Simmons came to his home uninvited. Appellant brought drugs that they all shared and then demanded he pay for everything when they finished. When he said he would not pay, someone slapped a beer bottle out of his hand, pulled a gun on him, and made him get in his car to go get money. The people with him were choking him, poking him with a gun, and saying they would take him to a hotel off Fulton Industrial Boulevard to kill him. Felicia testified that she went to her father's home after visiting him in the hospital and saw an opened bottle of

---

[3] On cross-examination, Shivers admitted that she had not told officers in her pretrial statements that Johnson said Atkinson had been choked.

11

beer on the living room floor.

Appellant was interviewed on February 6 by Lt. Cross; that interview was audio-recorded, and a portion was played for the jury. In that interview, Appellant said that Atkinson owed him money for drugs and for prostitutes. He admitted that during the drive on January 24, he was yelling at Atkinson about the money; he was planning to take Atkinson to an apartment where Atkinson had never been and hold him there until after midnight when Atkinson could withdraw money from an ATM; he was "dead serious" about not going back to the Skyway; and he grabbed the steering wheel right before Atkinson jumped out of the car.

Appellant testified in his own defense as follows. He lived at the Travelodge and dealt drugs for a living. On January 24, 2012, Simmons drove him to Atkinson's home to deliver drugs that Lundy had requested. He, Atkinson, Simmons, and Lundy shared the drugs. At the time, Atkinson owed Appellant $300 for Lundy's company and $400 for the drugs. Atkinson wanted more crack after finishing the drugs Appellant brought, so he sent Appellant and

12

Simmons in his car with his ATM card to get cash. Appellant retrieved $300 — the daily limit — and purchased the crack and returned to Atkinson's home. At about 1:00 p.m., Appellant and Lundy left the home, borrowing Atkinson's car with his permission. Shortly thereafter, Atkinson called Appellant and asked him to pick up more drugs. Appellant went to a hotel near the Skyway to pick up the crack, but a police officer who knew he was driving on a suspended license saw him. Appellant went upstairs to wait for the police to leave but left the car running with his cell phone in the car. The police called a tow truck to impound the car, but Shivers and Atkinson arrived in time to take the car. Appellant believed that Atkinson told the police that he stole the car.

Later, Appellant returned to Atkinson's home with more crack. Atkinson and Appellant argued about Atkinson telling the police Appellant had stolen his car, and Appellant knocked a beer bottle out of Atkinson's hand while Atkinson was sitting in a chair. Appellant told Atkinson the crack he just picked up had to be paid for. Atkinson and Appellant left in Atkinson's car to get the money;

13

Atkinson was driving, Appellant was in the front passenger seat, and Simmons was in the back seat. Their first stop was the Skyway to ask Shivers for money. After that visit was unsuccessful, they saw Johnson across the street and picked her up. Johnson suggested they go to the truck stop to ask someone they knew there for money. They drove to the truck stop, but police officers were there, so they did not stop and headed back toward the Skyway. Police were also present at a store near the Skyway. Appellant had become irritated and saw Atkinson was about to turn toward the Skyway into oncoming traffic, so Appellant grabbed the steering wheel. The car continued forward while Atkinson argued with everybody in the car and someone on the phone about how he "bent over backwards" for them, but nobody would help him. Atkinson jumped from the car at the next light, and a car hit him while he stood in the street. Appellant placed the car in park and got out. Another car then struck Atkinson, and Atkinson leaned up against that car. Appellant unsuccessfully attempted to get Atkinson back in the car and noticed a man calling the police. He decided to leave in Atkinson's car

because he had outstanding warrants and because of the drugs in the car. He told Atkinson he was leaving and that because of the drugs and cup of liquor in the car, "the police was going to come" and that Atkinson "was going to go to jail." He told Simmons to tell Johnson to stay and tell the police what happened. He drove away and hid the drugs at a gas station, and then he drove to another gas station near the scene of the incident.

During the cross-examination of Appellant, the State questioned him about seven of his prior convictions — two for theft by taking a motor vehicle, four for providing false information to law enforcement, and one for possession of a firearm by a convicted felon.

2. Appellant raises several contentions in challenging the constitutional sufficiency of the evidence for his convictions for felony murder and for theft by taking.[4] In reviewing a challenge to

---

[4] Because we no longer automatically review sua sponte the sufficiency of the evidence, except that of murder convictions resulting in the death penalty, see *Davenport v. State*, 309 Ga. 385, 398-399 (846 SE2d 83) (2020), we limit our consideration to the specific arguments that Appellant makes in challenging the sufficiency of the evidence. See *Scoggins v. State*, 317 Ga. 832, 837 n.6 (896 SE2d 476) (2023).

15

the constitutional sufficiency of the evidence, we review the evidence in the light most favorable to the verdict. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). Our review "leaves to the jury the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts." *Wilkerson v. State*, 317 Ga. 242, 245 (892 SE2d 737) (2023) (cleaned up).

(a) Appellant first argues that there was insufficient evidence that Atkinson's death was caused by the injuries he received after he fell out of the car and that the State failed to prove that the underlying felony of aggravated assault with intent to rob had a sufficient nexus to Atkinson's death. These arguments implicate two elements of felony murder — proximate cause and that the victim's death must be caused "in the commission of" the predicate felony. See OCGA § 16-5-1 (c); *Eubanks v. State*, 317 Ga. 563, 569, 571-572 (894 SE2d 27) (2023). "Proximate cause is satisfied for purposes of felony murder when the death was a reasonably foreseeable result of the criminal conduct at issue," and the proximate cause element

16

"is met even if the death had an intervening act, so long as that intervening act was itself a reasonably foreseeable consequence of the criminal conduct." Id. at 571 (cleaned up). The "in the commission of" element requires that "the predicate felony must be at least concurrent with the homicide in part, and be a part of it in an actual or material sense." Id. at 572 (cleaned up).

With regard to proximate cause, Appellant points to evidence that while hospitalized, Atkinson developed an altered mental status, had to be restrained, and fought against the restraints. Appellant argues that Atkinson's rib fractures were likely a result of these complications and that the blood clots that caused Atkinson's death could have resulted from the rib fractures. He argues that such complications are reasonably foreseeable in a hospital setting and could have been the proximate cause of Atkinson's death.

These arguments, however, rely on a view of the evidence that is most favorable to the defense, rather than to the verdict, which is the proper standard. See *Jackson*, 443 U.S. at 319. Moreover, the

17

medical records and the testimony of the medical examiner, viewed in the light most favorable to the verdicts, were sufficient for a rational trier of fact to find beyond a reasonable doubt that the cause of death was blood clots resulting from the injuries Atkinson sustained on January 24. See, e.g., *Harris v. State*, 313 Ga. 653, 656-657 (872 SE2d 732) (2022) (evidence sufficient to establish nexus between defendant's shooting of victim and victim's death from blood clots resulting from being shot); *Treadaway v. State*, 308 Ga. 882, 884-885 (843 SE2d 784) (2020) (holding that evidence was sufficient and "whether [defendant's] actions were the sole cause of [her husband's] death or would have otherwise caused his death under different circumstances is immaterial," where evidence showed defendant beat her highly intoxicated, disabled husband with a metal broom while he was in the bathtub and cause of death was drowning and blunt-force trauma (cleaned up)). See also *Eberhart v. State*, 307 Ga. 254, 260-262 (835 SE2d 192) (2019) (evidence sufficient to uphold felony murder conviction based on aggravated assault where medical examiner testified that the victim

18

died from hypertensive cardiovascular disease exacerbated by physical exertion and TASER application).

With regard to the "in the commission of" element, Appellant argues that Atkinson voluntarily exited the car; that there was no physical evidence that Atkinson had been choked; and that Johnson said that she did not see a gun. Again, these arguments rely on a view of the evidence that is most favorable to the defense. The evidence, viewed in the light most favorable to the verdict, was sufficient to authorize a rational jury to find beyond a reasonable doubt that just before Atkinson exited the car, Appellant was threatening Atkinson with bodily harm if he did not pay the money owed; and that Appellant either pushed Atkinson out of the car, or Atkinson, in reasonable fear for his life, jumped out of the car. This evidence was sufficient to support Appellant's conviction for felony murder while in the commission of aggravated assault with intent to rob. See, e.g., *Adcock v. State*, 279 Ga. App. 473, 473-474 (631 SE2d 494) (2006) (evidence was sufficient to support conviction for aggravated assault with intent to rob where victim testified that

19

defendant jumped in car, demanded money, and threatened him with knife, and where defendant testified that he entered car because victim owed him money but that he did not threaten victim). See also Wayne R. LaFave et al., Substantive Criminal Law § 6.4 (h) (October 2023 online update) ("[i]mpulsive acts of the victim in an effort to escape being harmed by the defendant's conduct" are sufficient to establish causation between defendant's commission of felony and victim's death).

(b) Appellant also contends that there was insufficient evidence that he harbored an intent to deprive Atkinson of his car, a required element of his conviction for theft by taking of Atkinson's car. See OCGA § 16-8-2. Appellant points to testimony that Atkinson would often help his friends financially and would lend them his car, as well as own testimony that he had no intent to deprive Atkinson of his car. However, Appellant again fails to view the evidence in the light most favorable to the verdict. The evidence, viewed in the proper light, authorized the jury to find that Appellant, either by force or intimidation, caused Atkinson to exit the car; drove

20

Atkinson's car away while Atkinson was screaming for help; and lied about his identity when found in possession of the car. This evidence was sufficient to permit the jury to infer that Appellant intended to deprive Atkinson of his car, either permanently or temporarily. See OCGA § 16-8-1 (1) (a) (defining "deprive" as withholding, without justification, "property of another permanently or temporarily").

Moreover, the jury was not required to credit Appellant's testimony as to his intent to help Atkinson by taking the car away because it had drugs in it. In fact, if the jury disbelieved Appellant's testimony, such testimony could serve as substantive evidence that his intent was to deprive Atkinson of his property. See *Maynor v. State*, 317 Ga. 492, 498 (893 SE2d 724) (2023) (jurors are "authorized to consider their disbelief in Appellant's testimony . . . as substantive evidence of his guilt"). Under the proper standard of review set forth above, we conclude that the evidence at trial was sufficient to authorize a rational trier of fact to find that Appellant committed theft by taking. See, e.g., *Jones v. State*, 303 Ga. 496, 497-499 (813 SE2d 360) (2018) (evidence sufficient to support theft by taking

21

conviction where, after shooting his cousin, defendant drove away from scene in his cousin's girlfriend's car, without her permission, and was still in possession of car when apprehended by police); *Shaw v. State*, 247 Ga. App. 867, 871-872 (545 SE2d 399) (2001) (evidence sufficient to support intent element of conviction for theft by taking where there was evidence suggesting that the victim may have given the defendant her car keys, but there were also circumstances, including defendant's demeanor toward victim and when confronted by officers, that permitted jury to infer defendant's criminal intent to deprive victim of her property).

3. Appellant contends the trial court erred in failing to grant a new trial as a "thirteenth juror" under OCGA §§ 5-5-20 and 5-5-21. OCGA §§ 5-5-20 and 5-5-21, respectively, allow the trial court to grant a new trial "[i]n any case when the verdict of a jury is found contrary to evidence and the principles of justice and equity," or when "the verdict may be decidedly and strongly against the weight of the evidence even though there may appear to be some slight evidence in favor of the finding." "Grounds for a new trial under

these Code sections are commonly known as the 'general grounds,'" and these statutes "give the trial court broad discretion to sit as a thirteenth juror and weigh the evidence on a motion for new trial alleging these general grounds." *Allen v. State*, 315 Ga. 524, 531 n.5 (883 SE2d 746) (2023) (cleaned up).

Appellant's claim is not subject to our review because the decision to grant or deny a new trial under these statutes is vested solely within the discretion of the trial court and is not subject to review on appeal. See *Ridley v. State*, 315 Ga. 452, 456 (883 SE2d 357) (2023).[5] To the extent that Appellant contends that the trial court failed to exercise its discretion as a "thirteenth juror" by his argument that the trial court failed "to address the specific issues raised in the amended motion for new trial," the record clearly demonstrates otherwise. The trial court's order on the motion for new trial stated that it "has reviewed the evidence of record,

---

[5] See also *King v. State*, 316 Ga. 611, 616 n.8 (889 SE2d 851) (2023) (noting many Justices' skepticism about prior case law that imported an analysis of the constitutional sufficiency of the evidence into the consideration of a "thirteenth juror" claim).

23

including re-examining such factors as the weight of the evidence and credibility of the witnesses . . . as an independent fact finder."[6] Thus, the trial court plainly applied the proper standard under OCGA §§ 5-5-20 and 5-5-21, and this claim fails.

4. Appellant challenges the admission of his post-arrest interview by police on the sole ground that he was not advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966). "To use a defendant's custodial statements in its case-in-chief, the State must show that the defendant was advised of his *Miranda* rights and that he voluntarily, knowingly, and intelligently waived them." *Huffman v. State*, 311 Ga. 891, 893 (860 SE2d 721) (2021) (cleaned up). A written waiver of rights is not necessary; a suspect advised of his rights orally can waive them. See id. at 895. In ruling upon the admissibility of a custodial statement, a trial court must consider the totality of the circumstances. See id. at 893. We review a trial court's factual findings and credibility

_____

[6] The trial court's order stated that Appellant's second amended motion for new trial raised "in a scattershot manner" "hosts of evidentiary complaints"; the trial court overruled the claims "en bloc."

24

determinations for clear error and apply the law de novo. *White v. State*, 307 Ga. 601, 602 (837 SE2d 838) (2020).

On February 6, 2012, Lt. Cross spoke to Appellant at the Fulton County Jail and notified him that he was being charged with murder in connection with Atkinson's death. At trial, Lt. Cross testified outside the presence of the jury that he explained to Appellant that he did not have to speak with him and held up a waiver-of-rights form so Appellant could see it. There was no pen for Appellant to sign the form, but Appellant said, "I understand" and that he wanted to speak with Lt. Cross. Additionally, Appellant testified at trial that when Lt. Cross spoke with him, he understood his *Miranda* rights and spoke with the officer willingly. Under these circumstances, we conclude that this claim fails.

5.    Appellant also contends the trial court committed plain error in several ways.[7] To show plain error, Appellant must identify

_____

[7] We review assertions of plain error related to the admission or exclusion of evidence under OCGA § 24-1-103 (a), (d), which together provide that "[e]rror shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected," and that "[n]othing

25

an error that was not affirmatively waived; that was clear and obvious beyond reasonable dispute; that affected his substantial rights, which generally requires an "affirmative showing" that the error probably did affect the outcome below; and that the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. See *Ruthenberg v. State*, 317 Ga. 227, 230-231 (892 SE2d 728) (2023). "Satisfying all four prongs of this standard is difficult, as it should be." Id. at 231 (cleaned up).

(a) First, Appellant challenges the admission of certain evidence during the testimony of Gallo, who testified with the assistance of an interpreter, as hearsay, see OCGA § 24-8-802, and as a violation of his right of confrontation under the Sixth Amendment to the United States Constitution. Toward the conclusion of Gallo's direct examination, she commented that her sister-in-law, who was in the car with her, was translating Atkinson's statements from English into Spanish. Appellant's trial

in this Code section shall preclude a court from taking notice of plain errors affecting substantial rights although such errors were not brought to the attention of the court."

26

counsel objected, arguing that Gallo's testimony about Atkinson's statements was hearsay, because she was relying on her sister-in-law's translation. The trial court asked the State for a response, and following a bench conference, the State asked Gallo about her ability to understand English. Gallo testified that she understands some English; that she had an independent understanding of what Atkinson was saying; and that she understood that Atkinson was screaming, "They're trying to kill me." She also testified that her sister-in-law was translating because someone else in the car with them did not understand any English. Following this testimony, Appellant did not ask for a ruling on his objection and did not renew it.

Appellant contends that Gallo's reliance on her sister-in-law as an interpreter constituted hearsay. Pretermitting whether Appellant affirmatively waived this objection, we conclude that the trial court did not err, much less make a clear or obvious error in admitting Gallo's testimony, given the particular hearsay objection made below and given Gallo's clarification that her testimony was

27

based on her independent understanding of Atkinson's statement that "they're trying to kill me." Thus, Appellant has failed to show plain error.

Appellant also asserts, in a single sentence, that the admission of the testimony of Gallo's sister-in-law violated his right of confrontation under the Sixth Amendment to the United States Constitution. See *Crawford v. Washington*, 541 U. S. 36 (124 SCt 1354, 158 LE2d 177) (2004). A confrontation clause violation under *Crawford* occurs when the out-of-court statement is "testimonial." Id. See also *Munn v. State*, 313 Ga. 716, 724 (873 SE2d 166) (2022) (statement is "testimonial" where "its primary purpose is to establish evidence that could be used in a future prosecution" (cleaned up)). Here, however, Gallo's sister-in-law's translation of Atkinson's cries to bystanders for help is not testimonial. See *Bulloch v. State*, 293 Ga. 179, 182-183 & n.3, 186 (744 SE2d 763) (2013) (rejecting argument that victim's statement to brother identifying defendant as person who should be suspected if "anything out of the ordinary happens" victim was testimonial

28

within meaning of *Crawford*). Therefore, this claim of plain error fails.

(b) Second, Appellant contends that the trial court plainly erred in allowing the prosecutor to use leading questions in examining Gallo and to repeat questions to several witnesses that had been asked and answered. However, Appellant has not set forth any of the allegedly improper questions or answers, instead, simply including string cites to pages of the trial transcript. With respect to the allegedly leading questions, our review of the record shows that they easily could have been rephrased in an unobjectionable way to elicit the same testimony. With respect to the questions that allegedly had previously been asked and answered, we conclude that the answers given were cumulative of testimony that Appellant has not challenged on appeal. Moreover, Appellant has failed to explain how any of the alleged errors were of a nature to have "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Ruthenberg*, 317 Ga. at 230. Thus, Appellant has failed to meet his burden of showing that the allegedly improper

questions likely affected the outcome of the trial. See *McCalop v. State*, 316 Ga. 363, 375 (887 SE2d 292) (2023) (plain error claim fails when appellant cannot establish that allegedly improper testimony likely affected outcome of trial); *United States v. Coleman*, 914 F3d 508, 512 (7th Cir. 2019) ("even when they are improper, leading questions rarely give rise to plain error"). See also *Davis v. State*, 306 Ga. 140, 149 (829 SE2d 321) (2019) (holding that appellant failed to establish prejudice stemming from counsel's failure to object to leading questions because an objection was unlikely to have prevented the admission of the testimony); *Grier v. State*, 313 Ga. 236, 246 (869 SE2d 423) (2022) (equating the prejudice prong of the plain-error test with the prejudice prong for an ineffective-assistance claim).

(c) Third, Appellant contends that the trial court committed plain error in allowing the prosecutor to repeat Appellant's testimony in cross-examining Appellant. However, there is no error, much less a clear and obvious one, in a party exercising its right to "a thorough and sifting cross-examination," OCGA § 24-6-611 (b),

30

and using leading questions to reiterate the witness's testimony on direct in doing so. See OCGA § 24-6-611 (c) (leading questions "shall be permitted on cross-examination").

(d) Fourth, Appellant contends that the trial court plainly erred by admitting facts underlying Appellant's prior convictions. Outside the presence of the jury, the parties discussed the State's ability to impeach Appellant with proof of his prior convictions. When the trial court ruled that seven of Appellant's prior convictions — including four for giving false information to law enforcement — would be admissible, it also advised the parties that the State would not be permitted to go into the details of the convictions. On cross-examination, Appellant admitted he had been convicted of the prior offenses, and the State introduced, without objection, exhibits supporting each conviction.[8] The prosecutor also asked Appellant a few questions about why he lied to law enforcement, whether he had

---

[8] These exhibits included two indictments that contained counts for which Appellant was not convicted. In this appeal, Appellant does not cite the exhibits or make any argument related to their admission, and thus any issue regarding them is not properly before us.

31

experience trying to avoid arrest by giving a false name to officers, and referred to Appellant's testimony on direct examination admitting that he gave Cpl. Jira his brother's name when he was arrested.

OCGA § 24-6-609 (a) (1) ("Rule 609") states that "evidence that an accused has been convicted of [a felony] shall be admitted if the court determines that the probative value of admitting the evidence outweighs its prejudicial effect to the accused." Rule 609 (a) (1) is identical in all relevant respects to the corresponding federal rule, and in such circumstances, we look for guidance to federal case law, especially case law from the United States Supreme Court and federal appellate courts, including particularly the Eleventh Circuit Court of Appeals. See *Almanza v. State*, 304 Ga. 553, 556-558 (820 SE2d 1) (2018) (when Georgia courts consider the meaning of the current Evidence Code, they should be guided by federal case law, particularly the decisions of the Eleventh Circuit, prior to its adoption, until a Georgia appellate court decides the issue under the new Code). Under Federal Rule of Evidence 609 (a), while the fact of

the conviction, the nature of the conviction, and the punishment are all properly admitted, the specific facts and circumstances of the prior convictions generally are not admissible. See *United States v. Morrow*, 537 F2d 120, 141 n.31 (5th Cir. 1976);[9] *United States v. Lopez-Medina*, 596 F3d 716, 738 (10th Cir. 2010).[10]

Pretermitting whether the prosecutor's few additional questions about the false-information convictions were improper, Appellant has not made an affirmative showing that any such error probably affected the outcome below, as required to prevail on his plain error claim. See *Ruthenberg*, 317 Ga. at 230-231. There was overwhelming evidence, including Appellant's own testimony, that Atkinson exited the car because he reasonably feared for his life, as well as substantial medical testimony that the injuries Atkinson

---

[9] Decisions of the former Fifth Circuit rendered before the close of business on September 30, 1981, are binding in the Eleventh Circuit. See *Bonner v. City of Prichard*, 661 F2d 1206, 1209 (11th Cir. 1981) (en banc).

[10] Appellant cited only cases decided under our former Code, and we have found none addressing the specific issue under our current Code. Therefore, we rely on federal case law. See *Brown v. State*, 307 Ga. 24, 30 n.2 (834 SE2d 40) (2019) (looking to federal case law to address harmless error in relation to argument about the use of a conviction to impeach a witness other than the accused).

sustained on January 24 were the proximate cause of his death. Additionally, Appellant admitted in his trial testimony that after being found in possession of Atkinson's car, he provided a false name to Cpl. Jira, and the State's closing argument made only a brief reference to Appellant's prior convictions. See id. at 231 (holding that any error in admitting evidence of prior convictions did not constitute plain error where appellant failed to make affirmative showing that admission likely affected outcome of trial).

(e) Finally, Appellant argues plain error based on his appellate counsel's inability to obtain transcripts for four pretrial hearings that occurred under his first indictment, which was later superseded, and on the trial court's limiting his time for questioning his trial counsel at the hearing on the motion for new trial. However, these alleged errors are not subject to plain-error review. See *Keller v. State*, 308 Ga. 492, 497 (842 SE2d 22) (2020) (listing limited categories of alleged errors for which plain-error review is available).

For all these reasons, Appellant's claims of plain error fail.

6. Next, we address Appellant's contention that the trial

34

court abused its discretion in overruling several evidentiary objections. We review a trial court's rulings admitting or excluding evidence for an abuse of discretion. See *Anglin v. State*, 302 Ga. 333, 335 (806 SE2d 573) (2017). We will reverse a conviction for a trial court's evidentiary error only if it was harmful. See id. at 336; OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."). The test for determining nonconstitutional harmless error is whether "it is highly probable that the error did not contribute to the verdicts," and in conducting that analysis, "we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done." *Brock v. State*, 316 Ga. 256, 260 (886 SE2d 786) (2023) (cleaned up).

(a) Appellant contends that the trial court erred in overruling several objections during Lt. Cross's testimony. First, he contends that the trial court abused its discretion in overruling his hearsay objection when Lt. Cross testified that Johnson said during her pretrial interview that Appellant and Atkinson were having a

heated argument in the car. However, OCGA § 24-8-801 (d) (1) (A) provides, in part, "[a]n out-of-court statement shall not be hearsay if the declarant testifies at the trial or hearing, is subject to cross-examination concerning the statement, and the statement is admissible as a prior inconsistent statement . . . under Code Section 24-6-613 or is otherwise admissible under this chapter." OCGA § 24-6-613 (b) provides, in relevant part, that "extrinsic evidence of a prior inconsistent statement by a witness shall not be admissible unless the witness is first afforded an opportunity to explain or deny the prior inconsistent statement and the opposite party is afforded an opportunity to interrogate the witness on the prior inconsistent statement or the interests of justice otherwise require." Here, the recording of Johnson's pretrial interview was played for the jury, and Appellant cross-examined her about alleged inconsistencies between her pretrial statement and her trial testimony. Thus, Lt. Cross's testimony about Johnson's statement was not inadmissible hearsay. See *Neloms v. State*, 313 Ga. 781, 788-789 (873 SE2d 125) (2022) (investigator's testimony about witness's prior statements

36

was admissible as prior inconsistent statements where witness was present at trial, was asked about statements to investigator, and was subject to cross-examination).

Second, Appellant contends that the trial court abused its discretion in overruling his objection to the prosecutor asking Lt. Cross whether Appellant's pretrial statement was consistent with facts uncovered by the investigation, to which Lt. Cross responded, "There were some discrepancies." On appeal, Appellant argues that a witness may not give opinion testimony on the "ultimate issue," citing case law decided under the former Evidence Code. However, at trial Appellant provided no basis for his objection, stating merely "objection." See OCGA § 24-1-103 (a) (1). We pretermit whether the trial court abused its discretion in overruling Appellant's objection. Compare OCGA § 24-7-701 (a) (1)-(2) (authorizing the admission of witness testimony in the form of a lay opinion where it is "[r]ationally based on the perception of the witness [and] [h]elpful to a clear understanding of the witness's testimony or the determination of a fact in issue"); *Jones v. State*, 299 Ga. 40, 44 (785

37

SE2d 886) (2016) (no plain error in eliciting, on redirect, testimony from officer that evidence from eyewitness was more consistent with other facts uncovered in investigation than information provided by defendant, where officer had been cross-examined about the manner in which she conducted investigation). We conclude that any error was harmless because the jury ultimately heard, without objection, testimony from multiple witnesses that contradicted Appellant's pretrial statement, and Lt. Cross's response — that there were some discrepancies — was merely cumulative of that testimony.

Third, Appellant asserts that the trial court abused its discretion in overruling a single "leading" objection when the prosecutor asked Lt. Cross if Appellant admitted in his pretrial interview that he tried to get money from Atkinson. However, Appellant has failed to demonstrate harm given that the jury heard Appellant's pretrial interview in which he admitted that he wanted Atkinson to pay him for the drugs. Thus, regardless of whether the trial court abused its discretion in overruling the objection, Appellant has failed to demonstrate harm. See *Merrit v. State*, 310

Ga. 433, 438-439 (851 SE2d 555) (2020) (any error in allowing State to ask leading questions was harmless, in part, because much of testimony elicited with leading questions was cumulative of other evidence).

(b) Appellant also contends that the trial court abused its discretion in overruling his hearsay objection to testimony by Atkinson's daughter Felicia about the conversation she had with her father the day after he was admitted to the hospital. Regardless of whether the trial court abused its discretion in overruling Appellant's hearsay objection, any error was harmless because Felicia's testimony was cumulative of the testimony of multiple other witnesses. See *Leonard v. State*, 316 Ga. 827, 834 (889 SE2d 837) (2023) (pretermitting whether trial court erred in admitting statements victim made before his death and holding that any error was harmless where substance of statements was cumulative of other properly admitted testimony). See also *Anglin*, 302 Ga. at 336 ("The erroneous admission of hearsay is harmless where substantial, cumulative, legally admissible evidence of the same fact

is introduced.").

For these reasons, Appellant's claims that the trial court abused its discretion in overruling his evidentiary objections do not require reversal.

7.      Finally, Appellant contends that he was denied effective assistance of counsel due to his trial counsel's decision to call the paramedic as a witness; failure to object to Cpl. Jira's testimony that criminal activity was frequent in the neighborhoods where Atkinson was injured and Appellant was apprehended; and failure to retain an expert witness to address proximate cause.[11] To establish his claim of ineffectiveness of counsel, Appellant must prove both deficient performance by his trial counsel and resulting prejudice. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80

---

[11] In the "plain error" enumerations addressed in Division 5 above, Appellant asserts "alternatively" that trial counsel was ineffective. However, he makes no substantive argument regarding trial counsel's alleged deficiencies in these matters. Accordingly, we do not address these claims of ineffectiveness. See Former Supreme Court Rule 22 ("Any enumerated error not supported by argument or citation of authority in the brief shall be deemed abandoned."). Our Rule 22 (1) now provides, "Any enumerated error or subpart of an enumerated error not supported by argument, citations to authority, and citations to the record shall be deemed abandoned."

LE2d 674) (1984). To establish deficient performance, Appellant must show that his attorney's acts or omissions were "objectively unreasonable . . . considering all the circumstances and in the light of prevailing professional norms." *Davis v. State*, 299 Ga. 180, 182-183 (787 SE2d 221) (2016). The law recognizes a "strong presumption" that counsel performed reasonably, which the defendant bears the burden of overcoming. *Strickland*, 466 U.S. at 689. To establish the required prejudice, Appellant must show that but for his attorney's objectively unreasonable errors, there is a reasonable probability that the result of the proceeding would have been different. See id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. We "need not address both components of the inquiry if the defendant makes an insufficient showing on one." *Davis*, 299 Ga. at 183. (cleaned up).

(a) Appellant asserts that trial counsel was deficient in calling the paramedic as a witness because her testimony — that Atkinson said he jumped out of the car because people were trying to kill him

— corroborated the State's theory of the case. At the hearing on the motion for new trial, trial counsel testified that he called the paramedic because her report indicated that Atkinson told her a different version of events than he had told his daughter. He also testified that he tried to interview the paramedic before trial, but she was "hesitant" to talk to him. At trial, trial counsel did not attempt to impeach the paramedic with her report, and the report was not admitted into evidence.

However, assuming that trial counsel was professionally deficient in calling the paramedic to testify, Appellant has failed to demonstrate that there is a reasonable probability that the paramedic's testimony affected the outcome of the case, given that the paramedic's testimony was cumulative of Gallo's testimony that she heard Atkinson yelling that he had been kidnapped and that men were trying to kill him. See generally *Payne v. State*, 314 Ga. 322, 330 (877 SE2d 202) (2022) (any deficiency in counsel's failure to object to alleged hearsay was not prejudicial where the testimony was cumulative); *Koonce v. State*, 305 Ga. 671, 675 (827 SE2d 633)

(2019) (appellant failed to show prejudice from trial counsel's failure to object to certain testimony that was largely cumulative of other evidence).

(b) Cpl. Jira testified that he was frequently called to respond to reports of criminal activity around the accident scene and around the location where Appellant was apprehended. Appellant contends that his trial counsel was professionally deficient in failing to object to this testimony because it was irrelevant and served only to inflame the jury. However, even assuming that the evidence was irrelevant and properly subject to an objection under OCGA § 24-4-402 ("Evidence which is not relevant shall not be admissible."), Appellant has not shown that his trial counsel's failure to object was patently unreasonable, given that the testimony was cumulative of the testimony of several other witnesses and consistent with Appellant's own testimony that he was involved in criminal activity and frequented those areas. Thus, Appellant has not shown that his counsel was deficient in failing to object to Cpl. Jira's testimony. See *Sawyer v. State*, 308 Ga. 375, 384 (839 SE2d 582) (2020) (trial

43

counsel not deficient in failing to object to cumulative testimony).

(c) Appellant asserts that trial counsel was deficient in failing to utilize an expert witness to counter the testimony of the medical examiner as to the cause of Atkinson's death. Trial counsel testified that causation is a difficult issue for a defense attorney given existing case law. He also explained that his strategy was to show that Appellant's actions did not cause Atkinson to jump out of the car and that Atkinson instead jumped out of the car due to the intoxicating effects of cocaine and alcohol. Even assuming that trial counsel was deficient in not retaining a medical expert on proximate cause, Appellant has failed to establish prejudice. At the hearing on the motion for new trial, Appellant did not present the testimony of, or an affidavit from, an expert witness that countered the State's medical expert. Accordingly, Appellant has failed to show *Strickland* prejudice. See *Pauldo v. State*, 317 Ga. 433, 437 (893 SE2d 633) (2023) ("It is well established that a defendant fails to establish prejudice under *Strickland* when he merely contends that trial counsel was deficient for failing to present an expert, without also

presenting evidence at the motion-for-new-trial hearing about what the potential expert would have testified to at trial.").

Accordingly, Appellant's claims that he was denied effective assistance of counsel fail.[12]

*Judgment affirmed. All the Justices concur.*

---

[12] Appellant states in passing that the collective prejudice from trial counsel's deficiencies "has the potential" to establish prejudice under *Strickland*, but he fails to make any argument as to how he was prejudiced by the cumulative effect of the alleged deficiencies. He also states in the final sentence of his brief that the claims raised on appeal "individually and collectively" require reversal. However, he again fails to make any argument that the collective prejudice from the alleged deficiencies of his trial counsel and from the alleged trial court errors requires reversal. See *State v. Lane*, 308 Ga. 10, 18 (838 SE2d 808) (2020) ("A defendant who wishes to take advantage of the [cumulative error rule] should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors." (cleaned up)). In any event, we conclude that Appellant has failed to establish that the combined prejudicial effect of the five assumed trial court errors of an evidentiary nature, which we address in Divisions 5 and 6, and the three assumed instances of deficient performance of trial counsel denied him a fundamentally fair trial. See, e.g., *Huff v. State*, 315 Ga. 558, 568 (883 SE2d 773) (2023) (rejecting cumulative error claim "because Appellant has not demonstrated that the prejudicial effect of the assumed trial court errors and ineffective assistance denied him a fundamentally fair trial").